Good morning, Your Honors. May it please the Court. My name is Liza DeVries. I'm here on behalf of the Plaintiff Appellant, Glenn Scotti. I'd like to touch upon three issues in my argument this morning, Your Honor. First, why this case is so unique, factually and legally. Second, the elephant in the room, how probable cause should be interpreted here. And third, the public policy implications of affirming a district court's ruling that a private investigator may be prosecuted based on fabricated, manufactured evidence, and that that is not malicious prosecution, or at least something that a disputed fact should be decided by a jury and not by a judge. Would you agree, Counsel, that at least for purposes of our panel, the whole issue revolves around probable cause? Whether you agree that if there is probable cause that your client loses? Yes, Your Honor. Okay. And do you also agree that probable cause, as currently defined, creates a real problem for your client? I'm not sure I understand your question. And I'm citing specifically Gonzalez v. City of Phoenix, which is an Arizona case, 2002, and defines probable cause as an absolute defense to malicious prosecution. Probable cause is an absolute defense. Okay. All right. So I gather your mission is to convince us that in this case there is no probable cause as is defined under Arizona law. Is that right? My mission, Your Honor, is to demonstrate how the record presents triable issues of fact as to probable cause that a jury should decide at trial. Okay. Go ahead. Thank you, Your Honor. What is unique about this case? We have a state criminal court determining that the manufactured perjured evidence of the defendant officer was so significant that it remanded an indictment by a grand jury to reevaluate the issue of probable cause. In my practice as a civil rights lawyer, I've never heard of anything like this. It's quite significant. I couldn't find any case like it in my search of cases in this country. Number two, the statute defining stalking in Arizona specifically excludes First Amendment protected activity. It therefore would specifically exclude the conduct RICO, excuse me, the conduct that Scottie did relating to his websites critical of the family courts in Maricopa County, Arizona. Number three, in Arizona, the state gives a license to private investigators specifically to, quote, conduct investigations to obtain information relating to the habits, conducts, movements, affiliations, associations, et cetera, of third parties under ARS 32-2401. Here, Mary Freund, the defendant officer, knew that Scottie was a licensed private investigator and a former probation officer. She knew all this. In fact, Ms. Freund's expert, Greg Meyer, stated that the reason she launched this investigation against Scottie was the discovery of his websites and the concern that she had regarding the website's content as it related to a sealed order in a family court, that this would be a violation of a family court order relating to sealed records, nothing at all relating to stalking. Number three, of course, we're looking at probable cause, and that must be viewed from the perspective of an objective officer who had the same information that Ms. Freund had in indictment June 12, 2007. The court must then decide, based on these facts, excising the manufactured and perjured evidence whether there would be sufficient probable cause for that reasonable officer with the same information to cause someone to be prosecuted or indicted. The district court failed to follow well-established law to make inferences in favor of the non-moving party as to the probable cause record. Let's start with the date December 18, 2006. Now, why is this a key date? It's a key date because Mary Freund put that date in her search warrant as the beginning time from which Scottie conducted anything that was illegal. It was the basis for her search warrant. It has been the basis of every criminal allegation against Glenn Scottie. And why? Well, because the family court issued an order on that date. Now, that order was filed under seal because that record has been sealed. However, a very close examination of that order will show unequivocally that there was nothing in that order that Glenn Scottie violated. Glenn Scottie wasn't even a party to that order. He was never served with that order. He was not a party to that family court proceeding. But the husband, and I don't know if I'm pronouncing the name right, is it Rako? Yes, I believe. Okay. Well, Mr. Rako, though, was a party. Why do you have, oh, that's just a reflection. Can you put your pen down? Oh. Or do you have the light on? Okay, wow. Blinding me. Rako was a party to that order, right? And he was prohibited from harassing his Miss Lewis, right? Absolutely. So why wasn't it reasonable for Miss, I don't know how you're pronouncing it, Freund? Freund? I say Freund. The officer? Why don't I say the officer? Why wasn't it reasonable for her to interpret that order as barring Mr. Rako from hiring a private investigator to, you know, presumably do what private investigators do, which could aid him in harassing his wife, or soon-to-be ex-wife? That doesn't strike me as an unreasonable interpretation of what the state court had ordered. Thank you for your comment. Here, Scottie was accused of violating the stalking statute. Well, as an aider and abetter, though, I mean, it's not the actions that Scottie needs to take to be liable or to be guilty of the crime with which he was charged. He doesn't have to personally put Miss Lewis in fear of death. He doesn't have to personally be in close proximity to her. He just has to help Mr. Rako do those things. And so that's what I'm saying. The officer looks at that order. It says very clearly that Mr. Rako is barred from harassing Miss Lewis. She finds out that, oh, Mr. Rako has hired this private investigator to do the kinds of things that private investigators normally do, like go through someone's trash. I mean, unfortunately here, it looks like there might have been wiretapping as well. Those are the kinds of things that typically lead to harassment. Would you agree with that? I would. Okay. So that's what I'm saying. It strikes me as a reasonable interpretation of what the state court had ordered for the officer to say that, oh, well, the mere hiring of a private investigator might be problematic in terms of what the state court had prohibited. It might be. But here, Freund didn't say that the order as it's written was what was problematic. Freund said that the order precluded the hiring or surveilling of Miss Lewis, which it did not. That order does not say you may not surveil or hire a private investigator. That order was an anti-harassment order relating to the sealing of records and other matters. So does that mean that a person who is covered by a family court injunction like that could contract with another party to do everything that, in this case, he was prohibited from doing and be scot-free? No. Isn't that, though, the very concern that was raised here, as my colleague mentioned? In effect, this is an aider and a better question, whether Mr. Scottie was hired to do the very thing that his employer could not do. On his behalf. Mr. Scottie obviously didn't do this just because he was having fun doing it. He was hired to do this by a client who clearly was unhappy and wanted to get some information and wanted to create some problems, apparently, from the record. Right. So the question is whether there is evidence to show that in the process of the stocking that had occurred. And that's really what we get down to, is it not? And we do. And thank you for clarifying all that, because that comes full circle back to December 18, 2006. Assuming Mary Friend had the interpretation that Your Honors have suggested, then any conduct after December 18, 2006 would be something we would be looking at very carefully in this Court. So let's do that. What occurred after December 18, 2006 that we can associate or connect to my client, Glenn Scottie? I am not here to defend Mr. Rico. I personally am offended by Mr. Rico's conduct that's in this record, and that's not what we're here to discuss. My client is Glenn Scottie, a licensed private investigator. What did he do and what evidence is there after December 18, 2006? What we have is a death threat that was anti-surveillance or anti-private investigator order, which did not exist. All we have are websites. All we have is contact. Let me go through these. I'll tell you what I understand from the record. Of course, Mr. Rico hired him, questioned whether that was okay in the order. But then Mr. Scottie created two websites on which were posted the name and age of Lewis's daughter. Your Honor, that was public record. It's in this... Telling you what... I understand. ...as being ultimately part of it and sealed information, which was not part of the public record regarding the Lewis-Rico court controversy. He's filmed Lewis's daughter's dance recital. He helped Rico wiretap Lewis's home and cellular phones and listened in on private conversations. Your Honor, the wiretap, the trash, the emails, all of that happened before December 18, 2006. Those were allegations relating to 2002 and 2003. Those did not relate to conduct after December 18, 2006. Okay. Now, I know you treat that December 18 as being a line of demarcation, though. But for purposes of a statute harassment, I mean, of stalking, why is that date critical? That date is critical because we are looking at what the objectively reasonable officer knew at the time based on what Friend knew at the time. Friend knew that she had to prove specific intent. Friend knew that that specific intent had to be proved to the accomplice statute in Arizona. You must have probable cause for that specific element of specific intent, and that's under United States v. Lopez 482 F. 3rd 1067 at 1072 through 1073. That's a Ninth Circuit decision, Oregon, 2007. So she needed to have specific intent evidence to tie Scottie to this conduct of Rico's. She did not have that specific intent evidence until there was an order precluding Rico from doing certain things. That order date is, therefore, critical. Also— Wait a minute. Wait a minute. So you're saying, you're saying if there was no order and your client did what he was alleged to do—and again, I don't know whether he did or not—but if he did, that the order is the key to whether or not stalking took place? I would have thought that independent of Mr. Renko or however you say his name, that if he did these things and if Ms. Lewis felt that she or her daughter's life was threatened thereby, that independently that your client could potentially be subject to a stalking allegation. What am I missing? The law in Arizona that was in effect of 2007, which was amended in 2008, and this may be where the district court was mistaken. I don't know. But in footnote number one on page 10 of my reply brief, I distinguish that the law required evidence on accomplice liability to show he was, quote, an accomplice of such other person in the commission of the specific offense. It was expanded. This accomplice liability law was expanded in 2008 to include the natural or probable or reasonable foreseeable consequences of an accomplice's conduct. So here we have a private investigator doing his job, collecting trash in 2002, watching and taking pictures from a public place. We're not talking about breaking and entering. We're talking about a public dance studio, taking pictures in the public. We're talking about things that private investigators do every day with no evidence whatsoever that his conduct was tied to any crime. But counsel, I don't know whether you have children or not, but I've got six of them. Four of them are girls. I do have children. If somebody went to one of my daughter's classes, repeatedly photographed them, and I'm just giving an example, and kind of skulked around taking pictures, you bet I'd be concerned. You bet I would wonder what they were doing and why they were doing it. I would too, Your Honor. And the question is whether he had a lawful purpose. And the lawful purpose was in the divorce proceedings because the mother was not using the father's last name. And the purpose of that particular single incident of videotaping related to the fact that on the program of that particular dance recital, it proved that the mother was violating the family court order by allowing the daughter not to use her father's last name. It was simply evidence of name, of lawful purpose to show. So taking pictures of the dance proved that? I'm sorry? Taking a picture of her dancing proved that? No, bringing the program to the family court. So he just took a picture of the program? It was in reference to a not just the program. Your Honor, the dance recital, first off, preceded the December 18th, but second off, even if it were relevant, what's relevant about it is its lawful purpose. In a custody battle proceeding regarding the name used by a child, a father is permitted to show evidence that the mother is using a different name. Okay, your time is up. Let me ask my colleagues if either of you have any questions. Your Honor, I had one quick point I just wanted to make, that if a lawyer is hired by somebody who is stalking or doing some other illegal purpose, a lawyer does his job. A lawyer is somebody who is licensed by the state they are in to do a job, just like a private investigator. This case would present a very dangerous precedent. A lawyer's privilege can be invaded if there's a crime fraud exception. However, a lawyer would not be accused of being an accomplice to a crime unless there is proof that that lawyer did something specifically, with specific intent, to do that crime. Tell me, on the phone tapping, where did that occur in relationship to the December 18 date? Four years prior, Your Honor, and there are disputed facts as to phone tapping. Glenn Scotty filed a declaration in opposition to summary judgment. That is in the record at volume 7, tab 58, ER 608-612, specifically denying that there is any wiretapping evidence. None has been presented other than hearsay and comments by Mary Friend, with no evidence in this record. I thought there were e-mails that suggested that wiretapping was going on. I understand. It wasn't just a moot. Those were pre-dated. Those were 2002, 2003, pre-dating this order. Okay. Thank you very much, counsel. We'll hear from the opposing counsel. Good morning. I'm Nicholas Aceto, and I'm arguing today on behalf of the Appellees. A lot has been said today about the order that was issued in December 2006. That order is not relevant, directly relevant, to the stalking charge against RICO. It is directly relevant to the aggravated harassment charge. The way that that aggravated harassment charge was pled, it's aggravated because the harassment violated a court order. The record does show that Detective Freund informed Mr. Scotty about that order when she first came across the websites. She told him, this is violating a court order, an injunction against harassment, and asked him to take it down and hear it. Can I just stop? I think it might be best if you proceed in this fashion. Let's hear your explanation for why the officer here, and let's forget about the other officers. How do you say the officer's name? Detective Freund. Freund. What evidence did she have to establish probable cause that RICO had, as a principle, had put Ms. Lewis in fear of death, or put, I guess it would be her daughter, in fear of death? Because that's what the charge requires, right? Just in terms of the principle's liability, and then we can talk about what probable cause existed to think that Scotty had aided and abetted that conduct. That's correct, Your Honor. First and foremost, the probable cause underlying Mr. RICO's arrest was not disputed in the district court. That was not raised in the briefing. Well, let's take the gray fiasco out of the picture, okay, because that is a total fiasco. Just take that out of the picture. Tell me, even though it's not disputed, tell me what evidence established probable cause that RICO had taken actions in the way that the statute defines the course of conduct that put Ms. Lewis or her daughter in fear of death. Well, the baseline for all this, Your Honor, was Detective Freund was part of the threat management team with the Phoenix Police Department. She was assigned to this case, the Family Court case between Kimberly Lewis and Andrew RICO. Because of Andrew's RICO, Mr. RICO's conduct, he was added to a database monitored by the Domestic Violence Unit. So that's the baseline, is that he's already on the radar because of his conduct. Over the years and throughout the litigation of the Family Court case, he made unfounded allegations against Lewis. He accused her of accusing him of molesting their child. He made threatening correspondence and inundated Ms. Lewis's attorney. But not with threats of bodily harm. It was threats that I'm going to get you disbarred, that kind of thing, right? Well, we have to look at the totality of the circumstances. And this is just all building up, Your Honor. No one piece of evidence I can stand up today and say this is it. And actually, the statute requires a course of conduct. So that's why we have to look at everything in its entirety. His actions resulted in that injunction against harassment. They were so bad that the family law judge had to say, look, you can't even make disparaging remarks about her. Stop communicating to anyone about this case. Despite that order, he continued to violate it and continued to talk to various people about the case. We know that he hired Mr. Scotty and assisted in posting items on that website, including his daughter's name, her age, and the child molestation accusations. He continued to send threatening letters to Ms. Renler, Lewis's attorney. I think what's important here, Your Honor, is that Kimberly Lewis told Detective Freund that she believed that Rico and Scotty were both stalking her and that she feared that Rico, quote, may go off and will come into her dance studio and try to kill her or hire someone to do so. Now — Okay. I'm with you. I forgot about that. Okay. But I have one question. So was Ms. Lewis deposed? In this matter, there's no evidence in this record of her deposition testimony. I'm saying did you take her deposition because it would have seemed critical to bolster what the officer is saying with the testimony of the person who allegedly made those statements. I don't believe that there was a deposition, a civil deposition in this case. Okay, because as you know, given the Gray fiasco, the officer's credibility is in serious doubt. And so you're right. I've forgotten that the officer does say that Ms. Lewis told me these things, which would seem to qualify under the statute. But that seemed like a glaring hole in your record for your client, that Ms. Lewis seems to never have been deposed. Well, I don't believe that she was deposed, Your Honor. In addition to the statements that — those statements that she told, that Lewis told Detective Freund, she also — Detective Freund was also made aware of a course of conduct over the years, nails and tires, which if you're driving on the road, your tire pops, you could crash and die. They found their dog drowned in the pool. Mr. Scotty admitted that he was on South Mountain taking photographs of Ms. Lewis's pool. So there's this course of conduct. And again, we're just — we're just talking about a reasonable suspicion that there may have been a crime committed. Well, no. There's probable cause is what we're talking about. Which under the Gonzales case is defined as a reasonable suspicion. So we just need to show, or she just needed to have a reasonable suspicion that he satisfied — that Mr. Rieco satisfied the elements of that statute. Okay. And again, that wasn't disputed below. Okay. So now let's switch to Scotty. And what evidence is there that Scotty knew that Rieco was engaging in the conduct that constitutes a principal violation of the statute? And then what steps did Scotty take to aid that endeavor? And I have a list here. I'll just again preface it with, there was no challenge to the elements of the accomplice statute below. The only — the only argument made in the district court by Mr. Scotty was that his conduct didn't constitute a course of conduct, therefore, the stalking statute was not satisfied. He didn't even cite the accomplice liability statute. His argument was two sentences. And the district court relied on those admissions, considered them essentially confessions, concessions, and built upon that. It's only now, actually in her opening brief, that they tried to attack each of those findings, which it's our position that that is waived. But I'll go through — Where in the record are these admissions? Do you have that right off the top of your head? Well, the — What I mean is, you said that Mr. Scotty basically didn't challenge certain things and the district court relied on them. Can you refer to me in the record to where this occurred? Our motion for summary judgment laid out the elements of accomplice liability and went through all of the evidence, which the district court adopted, going through the trash, the wiretapping, which there were emails found in Scotty's home between Scotty and Rico that they were wiretapping and had, in fact, wiretapped. That was in our motion for summary judgment. Right. Her response to that motion for summary — Mr. Scotty's response to the motion for summary judgment didn't attack those. The controverting statement of facts just simply said that it was not relevant. Her focus was — Scotty's focus was there was no course of conduct by me, which is the Okay. That answers my question. Thank you. Getting back to your question, Judge Watford, we know he was hired to surveil Lewis and he was paid to do that. We have the emails about the wiretapping that were found in his home. So that had to have happened. Okay. And are you with agreement with your opponent that that happened years before the time period that's relevant here? I don't see how that's — I don't see how that's possible. Mr. Scotty and Mr. Rico knew each other for going back to college. I believe that he hired him closer to 2006. But if he hired him to surveil Lewis sometime in 2006 or shortly before, there were emails obviously related to that employment regarding wiretapping. And it's our position, Your Honor, that the December 6th date is not a start date for evidence. Right. We know that he dug through Lewis's trash. He filmed — he filmed — didn't take photographs — he filmed Ms. Lewis's daughter at her recital. Now, he's saying after the fact, well, we just wanted to know if the name was changed on the brochure because you're not supposed to use Rico's last name or Lewis's last name. Whatever that excuse is, true or not, I mean, that might be some defense evidence to that cause. He took, as I mentioned, photographs of Lewis's pool. He took photographs of Lewis's dance studio. He had a sexually explicit videotape of Ms. Lewis. He hosted the two BlackRub websites. And they want to try to minimize that because, in their opinion, that there was no threat, direct threat made against Ms. Lewis. We disagree with that. I mean, these websites were intended to threaten and intimidate Ms. Lewis, the family law judge, Detective Freund, and Lewis's attorney. They posted the home addresses and Google Maps of Detective Freund and the family law judge. And it was clear that Scotty was going through their trash. He had documented the days in which the trash pickup was. The websites, again, had the name and age of Lewis's daughter and recounted the child molestation accusations. That's sickening. And as you said, Judge Smith, that any person with children would be flabbergasted by that. I mean, I hear you. Listen, none of us is terribly sympathetic to Mr. Scotty, if any, of what's been alleged in terms of his conduct. But it's not we're not sitting here trying to figure out whether he's a good or a bad person. We're trying to figure out whether there was probable cause to believe that he violated this statute as an iterant or better. And I guess maybe you have more, but everything you've ticked through doesn't seem to me to in any way suggest that Scotty knew that RACO was on this campaign to put Miss Lewis in fear of death and that the actions he was taking, which otherwise, as I think your opponent has said, it's just the kinds of things that private investigators normally do, that Scotty knew that that was aiding this evil endeavor that Mr. RACO had undertaken. And that's what I guess I'm still waiting to hear from you. What is it that you can latch on to that shows probable cause to believe that thing? Well, I think if we go back to the statute, Your Honor, the accomplice liability statute, the conduct required is just that he aided or abetted or provided a means or opportunity. And I think what I just read off satisfies that. But it seems like you're focusing on what his intent was. And again you're saying that he violated this statute. Your opponent is right that at least at the time the statute was in, was the version that was in effect at the time that's relevant here, that it's not enough that just you as a non-principal took actions that helped somebody to be aided or abetted. You have to actually know that that's what the principal was doing and that your intent is to aid that person in accomplishing the objective that the criminal law prohibits, right? I don't believe that the statute requires evidence that Scotty was engaged in a course of conduct that would cause her to do it. I know. I'm with you on that. But you heard my question, right? Just in terms of the mens rea, that's just required as a general matter, to be an aider and abetter. The mens rea for the accomplice statute requires that he had the intent to commit an offense. And if you look at the statute on stalking … Well, let's look at the … just point me to the accomplice statute, because I guess I'm still stuck. Maybe I'm missing something that you're trying to tell us. The mens rea for the accomplice statute is included in the definition of accomplice, which is 13-301. Okay. All right. I got it. In this title, unless the context otherwise requires, accomplice means a person … fast forward … who with the intent to promote or facilitate the commission of an offense. Right. The offense that the principal is committing, right? That's correct. Okay. So that's what I'm saying. I … go ahead. And then if you look at the … what the … offense that the principal was committing stalking … Right. That only requires that he intentionally or knowingly engaged in the course of conduct. That put Ms. Lewis in fear of death. No. And that that conduct would cause a reasonable person to fear death. Not that Rico intended to cause her death, but that he intentionally or knowingly engaged in the course of conduct. Yeah. And that that conduct would cause a person reasonable death. So the stalking statute doesn't require proof that Rico intended to cause her death. I got you. And because of that … But to be liable as an aider and abetter, Scottie at least has to know, at least has to know, in addition to intend to help, but he has to know that Rico is doing something, engaging in a course of conduct, that a reasonable person would be put in fear of death. He at least has to know that that's what Rico is doing, right? And so what do you got that shows that he knew that? Well, he did know that he was being investigated for a crime. He did know that by maintaining these websites that violated an injunction against harassment. And circumstantially, I think we can infer from simply his relationship with Rico and all of the surveillance that he did, which they contended any private investigator's license to do. Well, that doesn't give you carte blanche permission to break the law. He may have been doing things that he would do on any other job, but there was at least probable cause of reasonable suspicion that he and Rico were in cahoots and were doing this to cause her fear of death. And again, I go back to Detective — I'm sorry, Kimberly Lewis's statements to Detective Freund that she believed that they were both harassing, that they were both stalking. And she also said that she felt that Rico and Scotty were behind all of these mysterious nails in the tires, the criminal property damage, and the dog drowning. Those are all statements to Detective Freund. And when we're talking about probable cause, we have to focus on what she was aware of at the time, what she was aware of, what she's told. She can't sit on information. And when it's involving a woman and her children and a history of litigation that she was the case detective assigned to that case, all of that, all of that in totality is at least a reasonable suspicion. I agree with you that the most powerful evidence supporting your client is the statements that Ms. Lewis made to her. But tell me if I'm wrong in thinking this. On this record, a jury would have to believe your client's account of what Ms. Lewis told her, because we don't have any independent cooperation of that from Ms. Lewis herself. Couldn't a reasonable jury on this record have serious doubts about whether your client has been truthful, given that she fabricated the stuff about Gray? That would just be based on an inference, Your Honor. There would be no underlying supporting evidence for that inference. I mean, they keep saying that Rico and Lewis manufactured and created the Sandra Gray information. But at the end of the day, it's their burden of proof to show that Detective Freund in the city of Phoenix maliciously prosecuted her. It's not the city's proof. All we have to do is show that Detective Freund had probable cause. And when you look at Detective Freund's police report, she documented everything that she saw and heard, including the statements by Ms. Lewis. And if they want to go after the credibility of Ms. Lewis's statements, it was their burden to list her as a witness and depose her and elicit that evidence. But to me, it's pure speculation what she would have said. I mean, I don't believe any of this is in the record, but there is extensive litigation on why there was an order against harassment in the first place. There was a petition for a violation of that order, which the court ultimately found after the charge that he held Rico in contempt because he did violate it. Ultimately, the questions raised by my colleague, perhaps, do they not go more to what would occur if there were an actual charge and then a trial, and these would be defenses, as opposed to whether or not there was probable cause? Yes, Your Honor. And again, any defense evidence that would maybe negate guilt would not undermine any probable cause of reasonable suspicion that Detective Freund had at that time. I want to ask one other question. From what I know, it has not been raised in this, but in the Al-Kid case, the Supreme Court, in defining whether there was probable cause, admittedly, in the context of qualified immunity, said that if an officer makes a mistake, that there's no liability. Now admittedly, that's not the Arizona statute, but what, if any, role should the Al-Kid, if you will, approach affect our thinking in this case? Very much so, Your Honor. We've raised qualified immunity as a defense from the beginning, and the cases uniformly hold that even if it's later determined that there was not probable cause, if the charging officer mistakenly believed, had a reasonable belief, although mistaken, that there wasn't probable cause, he or she is entitled to qualified immunity. And we've raised that again in our answering brief, and I think that's very important here, because even the Sandra Gray information, it was reasonable for her to believe that the information she was told was true, whether Dr. Gray was a psychologist or not. Everybody referred to her as Dr. Gray. She knew that the family court had appointed a psychologist to conduct a psychosexual examination, and Sandra Gray's role was one part of that examination. That was a reasonable mistake. Last point, her report only said that Gray gave an opinion. She never represented that Gray gave a professional opinion. That was something injected by the prosecutor during the grand jury indictment. Was an opinion given to her? Yes, by Lewis and by Rendler, and it was confirmed in her interview with Gray later on. Okay. Thank you. Other questions by my colleagues? We thank both counsel for their arguments. The case just argued is submitted.
judges: Wallace, Smith, Watford